UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 MAY 14  PM 1:48

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| NUVASIVE, INC. | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **LORNE JEFFREY BROWN** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

Civil Action No. ___2:19-cv-75___

## COMPLAINT

For its Complaint against Lorne Jeffrey Brown ("Defendant"), Plaintiff, NuVasive, Inc.

("NuVasive"), through its attorneys, states that:

### NATURE OF THE ACTION

1.     This action arises from Defendant's flagrant violations of his contractual

obligations – to which NuVasive is a third-party beneficiary – to not compete with NuVasive both

during and after his employment with NuVasive's exclusive distributor, Thermal Surgical, LLC

("Thermal Surgical").  Thermal Surgical terminated Defendant's employment on February 25,

2015, after he failed to deny selling products that compete with NuVasive's on behalf of another

company.  Defendant continues to sell competitive products for that company.

2.     NuVasive brings this action to recover damages for the harm Defendant's wrongful

conduct caused NuVasive.

### THE PARTIES

3.     NuVasive is a Delaware corporation with its principal place of business in San

Diego, California.  NuVasive is an innovative medical device company focused on the design,

development, and marketing of products and procedures to treat spinal disorders.  NuVasive

distributes its products through its highly-trained sales force which consists of internal sales representatives and exclusive outside distributors.

4.      Defendant is a resident of New Hampshire and resides at 10 Lynn Drive, Bedford, New Hampshire 03110.  Defendant worked as a sales representative for Thermal Surgical – a Vermont limited liability company and one of NuVasive's exclusive outside distributors – from June 30, 2013, through February 25, 2015.  Defendant is now employed by A2 Medical, Inc. ("A2 Medical"), Boston-based medical hardware distributor that markets products which compete with NuVasive's, including, but not limited to, products marketed by Zimmer Biomet, Spineology, and Osseus Fusion Systems.  Defendant's sales territory for Thermal Surgical encompassed hospitals in New Hampshire and Maine, including Lakes Region General Hospital ("LRGH") in Laconia, New Hampshire.  Prior to that, while working directly for NuVasive Defendant's sales territory also included Vermont.

## JURISDICTION AND VENUE

5.      This Court possesses original jurisdiction of this case under 28 U.S.C. § 1332 because this is a civil action between citizens of different states in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6.      Venue is proper in the District of Vermont pursuant to 28 U.S.C. § 1391(a), as a substantial part of the events or omissions giving rise to NuVasive's claims occurred in this district. Further, Defendant contractually consented to venue in this Court.

## ALLEGATIONS RELATING TO ALL COUNTS

### A. Introduction.

7.      The spinal hardware industry is highly competitive.  Participants in this industry entrust their sales representatives with confidential and proprietary information, give those sales

representatives access to their established customers, and often provide sales representatives with proprietary training.    Accordingly, the industry's standard and practice is to require sales representatives to sign confidentiality agreements, as well as non-competition and/or non-solicitation agreements upon hire.

### B. NuVasive Hires Brown As Its Sales Representative.

8.    Defendant began working for NuVasive as a sales representative in Vermont, New Hampshire and Maine on April 2, 2007.  Defendant had no experience in the medical device industry prior to becoming NuVasive's employee.

9.    As a condition of his employment, Defendant agreed to and signed a Statement Regarding Proprietary Information, Inventions Assignment and Non-competition Agreement (the "PIIA") on March 12, 2007.

10.    Prior to being allowed into his sales territory, and throughout his tenure as a NuVasive sales representative, Defendant received specialized training from NuVasive.

11.    NuVasive entrusted Defendant with its confidential and proprietary information, and, after training Defendant, gave him a sales territory which included established NuVasive customers.

12.    Defendant's responsibilities as a NuVasive sales representative included promoting NuVasive's products to surgeons and medical facilities, supporting surgeries in which surgeons utilized NuVasive's products, and generating goodwill with NuVasive's current and prospective customers.

### C. Brown Transitions to Thermal Surgical.

13.    Thermal Surgical became one of NuVasive's exclusive distributors in early 2013.

14.     Defendant transitioned to and began working for Thermal Surgical as a sales representative in Maine and New Hampshire on or about June 30, 2013.  Generally speaking, Defendant's responsibilities remained the same after this transition, and included promoting NuVasive's products to surgeons and medical facilities, supporting surgeries in which surgeons utilized NuVasive's products, and generating goodwill with NuVasive's current and prospective customers.

15.     NuVasive and Thermal Surgical continued to provide Defendant with specialized training and access to their confidential information after he transitioned to being a Thermal Surgical employee.

16.     As a condition of his employment, Defendant agreed to and signed a Sales Representative and Employment Agreement (the "2013 Agreement").  NuVasive attaches a copy of the 2013 Agreement as **Exhibit A**.

17.     On or about January 5, 2014, Defendant and Thermal Surgical entered into a new Sales Representative and Employment Agreement, which is incorrectly dated January 1, 2013 (the "2014 Agreement").  NuVasive attaches a copy of the 2014 Agreement as **Exhibit B**.  NuVasive also attaches a copy of the January 5, 2014, email from Defendant to Thermal Surgical containing the signed 2014 Agreement as **Exhibit C**.

18.     NuVasive is a third-party beneficiary to the 2013 Agreement and the 2014 Agreement.

19.     The first recitals of the 2013 Agreement and the 2014 Agreement note that, pursuant to the terms and conditions of Thermal Surgical's Exclusive Sales Representative Agreement with NuVasive, "Thermal Surgical is the exclusive agent to sell NuVasive's products."

20.     The second recitals of the 2013 Agreement and 2014 Agreement provide that

Thermal Surgical employs Defendant to sell NuVasive's products.

21.     The 2013 Agreement and 2014 Agreement both contain sections titled "Conflicts

of Interest." These sections provide, in relevant part:

> Representative represents and warrants to Thermal Surgical that it does not (nor
> does any entity or person affiliated with it) currently represent or promote any lines
> or products that are competitive with any NuVasive Product or with Thermal
> Surgical, and that it shall not (nor shall any entity or person affiliated with it) during
> the Term, directly or indirectly, represent, promote, sell or otherwise commercialize
> within the Territory (i) any lines or products that are competitive with any Product
> covered by this Agreement or (ii) any NuVasive products for use in spine surgery.
> Further, during the Term, Representative shall not, directly or indirectly, represent,
> promote, sell or otherwise commercialize any products (other than the Products)
> without the prior written consent of Thermal Surgical.

* * *

> Representative shall devote substantially all of his business time and attention to
> the performance of his duties hereunder and will not engage in any other business
> or profession or occupation for compensation or otherwise which would conflict
> or interfere with the performance of such services either directly or indirectly
> without the prior written consent of Thermal Surgical.

22.     Consistent with the "Conflicts of Interest" sections, Exhibit A to both the 2013

Agreement and the 2014 Agreement limits the products Defendant could sell on Thermal

Surgical's behalf to: "All NuVasive Products."

23.     Neither Thermal Surgical nor NuVasive ever gave Defendant permission to sell

products that were not associated with NuVasive.

24.     Section 5.5 of the 2013 Agreement and the 2014 Agreement impose certain

reasonable employment and post-employment obligations on Defendant, including duties of non-

competition and non-solicitation.

25.     Section 5.5 of the 2014 Agreement provides:

> During Representative's employment and for a period of eighteen (18) months
> following the expiration or termination of such employment, Representative shall

/2015284

5

*3853377.1*

not (i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in Thermal Surgical's reasonable judgment, compete with the NuVasive Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of Thermal Surgical or NuVasive to purchase any products or lines that are, in the Company's reasonable judgment, competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of Thermal Surgical's or NuVasive's employees, agents or representatives.

26.    The non-competition and non-solicitation provisions in the 2014 Agreement are reasonably designed to protect NuVasive's and Thermal Surgical's legitimate business interests. As a sales representative, Defendant received NuVasive's and Thermal Surgical's confidential information, was given access to their established customer base, and was charged with generating goodwill with new and existing customers on their behalf.

27.    Defendant and Thermal Surgical intended that the non-competition and non-solicitation provisions in the 2014 Agreement benefit NuVasive, and they entered into those provisions for NuVasive's direct benefit.

28.    The temporal and geographic restrictions in the 2014 Agreement's non-competition and non-solicitation provisions are reasonable.  The temporal restriction extends only for eighteen (18) months after Defendant's Thermal Surgical employment terminates; and the geographic restriction is limited to the territories where Defendant marketed NuVasive's products.

**D. Defendant Inherited NuVasive's Business At LRGH When NuVasive Hired Him In 2007.**

29.    LRGH was an established NuVasive customer when NuVasive hired Defendant in 2007.

30.    Throughout his relationship with NuVasive, LRGH – including the two surgeons who regularly perform spine surgeries at that hospital, Drs. Salerni and Lieberman (the "LRGH Surgeons") – was Defendant's largest customer.

/2015284

3853377.1

6

31.     Prior to the late summer/early fall of 2014, the LRGH Surgeons used NuVasive products for the majority of their procedures.

**E. Defendant Begins Selling Competitive Products While Still Employed By Thermal Surgical.**

32.     Defendant enjoyed a great deal of success during his tenure at Thermal Surgical, earning approximately $200,000 per year selling NuVasive's products.

33.     Historically, LRGH purchased approximately $100,000 of NuVasive products per month via Thermal Surgical. This historical average remained consistent through the first three quarters of 2014, with LRGH averaging $96,497 per month.

34.     Defendant and A2 Medical began discussing the prospect of Defendant joining A2 Medical at some point in 2014.

35.     On or before June 10, 2014, Defendant created a personal email account – jbnh926@gmail.com (the "Personal Email"). On June 10, 2014, Defendant sent "test" emails to his Personal Email and another personal email address he utilized, jbnh1@outlook.com.

36.     On August 14, 2014, Defendant telephoned one of A2 Medical's then-sales representatives, Myles Wilson ("Wilson"). Defendant and Wilson discussed converting NuVasive's business at LRGH to A2 Medical, and the manner in which Defendant would be compensated by A2 Medical during this call.

37.     On August 28, 2014, Wilson emailed information about one of A2 Medical's products that competes with NuVasive's products to Defendant.

38.     Shortly after the August 28, 2014, email, Defendant scheduled a dinner with one of the LRGH Surgeons for September 24, 2014, at the Chop House restaurant in Manchester, New Hampshire. Defendant, one or both of the LRGH Surgeons, and one or more of A2 Medical's representatives attended this dinner.

/2015284

7

3853377.1

39.     LRGH's use of NuVasive's products plummeted in August/September of 2014 because the LRGH Surgeons suddenly and without warning to NuVasive or Thermal Surgical began utilizing A2 Medical's products.  LRGH's purchase of NuVasive products via Thermal Surgical fell to a monthly average of $30,601 in the fourth quarter of 2014 and the first quarter of 2015.  LRGH currently purchases few, if any, NuVasive products.

40.     Defendant worked closely with A2 Medical to surreptitiously orchestrate the conversion of the LRGH business.  In order to keep NuVasive and Thermal Surgical from discovering that he was selling A2 Medical's products to LRGH, Defendant utilized his Personal Email when doing business with LRGH on behalf of A2 Medical and his Thermal Surgical email when communicating with NuVasive and Thermal Surgical.

41.     In October of 2014, Thermal Surgical began questioning Defendant about the decline of sales to LRGH.  Rather than telling Thermal Surgical the truth (that the LRGH Surgeons were using A2 Medical's products), Defendant blamed the decline on, among other things, a downturn in surgeries and issues surrounding insurance reimbursements.

42.     While NuVasive's business at LRGH dwindled, Defendant continued soliciting the LRGH Surgeons on A2 Medical's behalf, working with the LRGH Surgeons' staffs to schedule surgeries in which they would utilize A2 Medical's products, and supporting those surgeries.

43.     Removing any doubt that Defendant was working on A2 Medical's behalf while still employed by Thermal Surgical, A2 Medical began paying Defendant as an independent contractor in October of 2014.  A2 Medical paid Defendant a substantial sum as an independent contractor until Thermal Surgical discovered his deception and terminated Defendant's employment.  A2 Medical then "hired" Defendant as a regular employee and began paying him as such.

44.     Above and beyond Defendant's daily work for A2 Medical, Defendant, without

limitation, and via his Personal Email:

      a.   asked, on October 24, 2014, the LRGH Surgeons' assistant for permission to meet with the LRGH Surgeons "to review specifics of upcoming cases" in which the LRGH Surgeons would utilize A2 Medical's products;

      b.   shared, on November 4, 2014, his notes with one of the LRGH Surgeons that described changes the LRGH Surgeons wanted in certain surgical tools and implants distributed by A2 Medical;

      c.   accompanied, on or about November 20, 2014, one of the LRGH Surgeons to a "lab" conducted by a company that distributes its products through A2 Medical in order to familiarize the LRGH Surgeon with that company's products;

      d.   along with at least one other representative of A2 Medical, met, on November 25, 2014, with one of the LRGH Surgeons and solicited his usage of a bone growth stimulation system distributed by A2 Medical;

      e.   participated in a December 8, 2014, email exchange with one of A2 Medical's owners, Michael Deraps ("Deraps"), and one of the LRGH Surgeons in which Deraps informed the LRGH Surgeon that A2 Medical distributed a surgical instrument which would satisfy the surgeon's needs for an upcoming surgery;

      f.   met, on December 11, 2014, at least one of A2 Medical's representatives and one of the LRGH Surgeons for dinner at the Chop House in Manchester, New Hampshire (when scheduling this dinner, the LRGH Surgeon's office coordinator inquired as to whether this dinner alleviated the need for the doctor to attend a lunch with Defendant and Wilson); and

      g.   invited, on January 5, 2015, one of the LRGH Surgeons to join him for dinner with Wilson "to review implant options for your upcoming cases."

NuVasive attaches the email exchanges reflecting these acts as **Exhibits D** through **J**, respectively.

45.     Defendant's and A2 Medical's joint efforts led to a complete conversion of the

LRGH business from NuVasive to A2 Medical.  Indeed, as evidenced by a January 13, 2015, email

from one of the LRGH Surgeons' staff members to Defendant's Personal Email, the LRGH

Surgeons utilized whichever products Defendant chose.

46.     The above-referenced January 13, 2015, email stated, in part:  "We need to know please what system will be brought in for this.  Dr. S leaves it up to you and LRGH won't book anymore until they know what the equipment is.  Can you let me know asap please?"  Defendant responded "[W]orking on it.  Will get back to you shortly.  Thanks."  Later that day, Defendant informed the office coordinator that he would supply products distributed by A2 Medical for the surgery.  NuVasive attaches this email exchange as **Exhibit K**.

47.     Other evidence of Defendant's and A2 Medical's complete conversion of the LRGH business includes, without limitation:

    a. on January 15, 2015, one of the LRGH Surgeon's staff members asked Defendant (via his Personal Email) "what are we using for ALIF nowadays"; Defendant responded "Lanx Durango system,"

    b. on January 20, 2015, Defendant (via his Personal Email) asked one of the LGRH Surgeons' staff members for information about an upcoming surgery; and the staff member responded, in part, "[W]hatever you say for equipment...LOL"; and

    c. on January 23, 2015, one of the LRGH Surgeon's staff members asked Defendant (via his Personal Email) "[W]hat are we using for XLIF nowadays please?  Sorry to have to keep bothering you with these"; to which Defendant informed the staff member that the LRGH Surgeon will use Pinnacle products for certain surgeries and Biomet/Lanx's products for others.[1]

Plaintiffs attach these email exchanges as **Exhibits L** through **N**, respectively.

**F.  Thermal Surgical Terminates Defendant's Employment After Discovering He Was Selling Competitive Products On A2 Medical's Behalf.**

48.     On February 25, 2015, Thermal Surgical's owners confronted Defendant about the unexplained loss sales to LRGH, and terminated his employment when he failed to deny marketing competitive products to LRGH.  That morning, Defendant (via his Personal Email) confirmed an

---

[1] The Lanx Durango system as well as Pinnacle and Biomet products are all directly competitive with NuVasive's products.

upcoming surgery in which one of the LRGH Surgeons would utilize products distributed by A2 Medical. NuVasive attaches this email confirmation as **Exhibit O**.

49.     Defendant did not stop working on A2 Medical's behalf at LRGH after being terminated by Thermal Surgical.

50.     Within minutes of being terminated, Defendant informed one of the LRGH Surgeons (via his Personal Email) that he would no longer be able to support surgeries in which NuVasive products are used, and that he would "be in touch" with the surgeon. NuVasive attaches this email as **Exhibit P**.

51.     On March 4, 2015, Defendant (via his Personal Email) informed one of the LRGH Surgeons' staff members that he would "be in the area tomorrow" and asked if he "might grab a schedule for Dr. S and Dr. L cases booked through April." The next day, Defendant informed the office coordinator that he would be at LRGH "this afternoon" and stated "[P]erhaps I can swing by . . . ?" NuVasive attaches this email exchange as **Exhibit Q**.

52.     Defendant continued working on behalf of A2 Medical at LRGH through June 29, 2015. On that date Defendant telephoned the LRGH Surgeons' office and asked that they schedule surgeries through Deraps rather than himself. One of the LRGH Surgeons' staff members responded to this news by emailing Defendant (via his Personal Email) "What?? I'm not to email cases to you anymore? Do I email Mike for all the cases I would typically send to you. This is sad!!!" NuVasive attaches this email exchange as **Exhibit R**.

53.     Deraps is the "Mike" mentioned in the above-referenced June 29, 2015, email.

54.     Defendant communicated with the LRGH Surgeons and/or their staff on a weekly, if not daily, basis for purposes of conducting business on behalf of A2 Medical, between the time Thermal Surgical terminated his employment and June 29, 2015.

/2015284

11

*3853377.1*

### G. Brown Denies Any Wrongdoing And Denies Relevant Evidence.

55.     On March 24, 2015, NuVasive's counsel wrote a cease and desist letter to Defendant.   Through his attorney, Defendant denied violating his duty of loyalty or any of his contractual obligations not to sell products that compete with NuVasive's.

56.     After Thermal Surgical filed suit against Defendant in *Thermal Surgical, LLC v. Jeff Brown*, Civil Action No. 2:15-cv-220, United States District Court for the District of Vermont (the "Thermal Surgical Litigation"), he filed a verified answer, counterclaim, and third-party complaint in which he claimed, under oath, that he did not violate his duty of loyalty or any of his contractual obligations not to sell products that compete with NuVasive's.

57.     Through discovery responses, Defendant consistently swore that he did not violate any of his obligations to NuVasive or Thermal Surgical during the course of the Thermal Surgical Litigation.[2]

58.     Defendant intentionally destroyed evidence relevant to the Thermal Surgical Litigation and this lawsuit.

### COUNT I – BREACH OF CONTRACT THIRD-PARTY BENEFICIARY

59.     NuVasive repeats and incorporates by reference the allegations set forth in paragraphs 1 through 58.

---

[2] The Thermal Surgical Litigation was stayed as a result of Defendant declaring bankruptcy on September 20, 2016 in *In re Lorne J. Brown*, Case No. 16-11321-BAH, United States Bankruptcy Court for the District of New Hampshire (the "Brown Bankruptcy"). The Brown Bankruptcy is nearly completed with the claims liquidation process concluded and the approval by the Court of the Trustee's Final Report. Thermal Surgical challenged the Defendant's bankruptcy discharge, which ultimately led to the Defendant voluntarily relinquishing his discharge and removing the automatic stay. Prior to the expiration of the legal tolling of NuVasive's claims provided by 11 U.S.C. § 108, the parties executed a tolling agreement on December 20, 2018. Following unsuccessful settlement negotiations, NuVasive exercised its right under the tolling agreement to give Defendant 30 days written notice of the termination of the tolling agreement and set the effective date of the tolling agreement's termination at May 9, 2019.  NuVasive hereby brings this action to recover on its claims that were liquidated in the course of the bankruptcy to a fixed amount of damages owed by Defendant within the time permitted by the tolling agreement and applicable law. Upon information and belief, Thermal Surgical intends to revive and prosecute the Thermal Surgical Litigation.

/2015284

*3853377.1*

60.     The non-competition and non-solicitation obligations contained in Section 5.5 of the 2014 Agreement are valid, enforceable, and are supported by adequate consideration.

61.     The non-competition and non-solicitation obligations contained in Section 5.5 of the 2014 Agreement are reasonably limited in both time (eighteen (18) months following termination of employment) and in geographic scope (the territories in which Defendant worked on NuVasive's behalf).

62.     NuVasive is an intended third-party beneficiary to, among others, the non-competition and non-solicitation obligations contained in Section 5.5 of the 2014 Agreement.

63.     Section 5.5 of the 2014 Agreement requires that, during the term of and for the eighteen (18) month period after his Thermal Surgical employment, Defendant, within his former sales territory:

>    a.  not represent, promote, or otherwise try to sell products that compete with NuVasive's products; and
>
>    b.  not solicit, directly or indirectly, Thermal Surgical's or NuVasive's customers to purchase product that compete with NuVasive's products.

64.     Defendant breached the 2014 Agreement by converting NuVasive's LRGH business to A2 Medical both before and after Thermal Surgical terminated his employment.

65.     Defendant's contractual breaches caused NuVasive to incur monetary damages. The monetary value of the damages Defendant caused was liquidated as a part of Defendant's bankruptcy at $1,200,000.00 as of September 20, 2016.  Defendant is entitled to a credit against that amount for the $48,077.97 collected by NuVasive from the bankruptcy estate resulting in net amount owed as of September 20, 2016, of $1,151,922.03.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS

66.     NuVasive repeats and incorporates by reference the allegations set forth in paragraphs 1 through 65.

67.     Vermont adopted the Uniform Trade Secrets Act which is codified at Vt. Stat. Ann. Tit. 9, § 4601 and precludes the disclosure or use of trade secrets of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

68.     Upon information and belief, Defendant violated Vt. Stat. Ann. Tit. 9, § 4601 in converting NuVasive's LRGH business to A2 Medical both before and after Thermal Surgical terminated his employment.

69.     Defendant's statutory violations caused NuVasive to incur monetary damages. The monetary value of the damages Defendant caused was liquidated as a part of Defendant's bankruptcy at $1,200,000.00 as of September 20, 2016. Defendant is entitled to a credit against that amount for the $48,077.97 collected by NuVasive from the bankruptcy estate resulting in net amount owed as of September 20, 2016, of $1,151,922.03.

## COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

70.     NuVasive repeats and incorporates by reference the allegations set forth in paragraphs 1 through 70.

71.     NuVasive possessed valid business relationships with Defendant's Thermal Surgical customers, including without limitation, LRGH and the LRGH Surgeons.

72.     Defendant was aware of NuVasive's business relationships with his Thermal Surgical customers, including without limitation, LRGH and the LRGH Surgeons.

/2015284

3853377.1

14

73.     Defendant intentionally interfered with NuVasive's business relationships with his Thermal Surgical customers by surreptitiously converting their business to A2 Medical both before and after his Thermal Surgical employment terminated.

74.     The disruption of NuVasive's business relationships with Defendant's Thermal Surgical customers damaged NuVasive. The monetary value of NuVasive's damages Defendant caused was liquidated as a part of Defendant's bankruptcy at $1,200,000.00 as of September 20, 2016. Defendant is entitled to a credit against that amount for the $48,077.97 collected by NuVasive from the bankruptcy estate resulting in net amount owed as of September 20, 2016, of $1,151,922.03.

75.     Defendant's intentional interference was the cause of the damages NuVasive sustained.

## COUNT IV – PUNITIVE DAMAGES

76.     NuVasive repeats and incorporates by reference the allegations set forth in paragraphs 1 through 76.

77.     Defendant's intentional interference with NuVasive's business relationships was reprehensible and undertaken with malice.

78.     Additionally, beginning in October of 2014, Defendant began deliberately and fraudulently misrepresenting to NuVasive and Thermal Surgical the reason for the declining sales to LRGH. Instead of being truthful, Defendant repeatedly assured Thermal Surgical's owners that he was marketing NuVasive's products to the LRGH Surgeons despite knowing that he was marketing competitive products distributed by A2 Medical.

79.     NuVasive relied on Defendant's false and fraudulent misrepresentations to its detriment. Defendant allowed Thermal Surgical to continue letting him represent NuVasive

/2015284

3853377.1

products and pay him commissions during this period while also receiving payments from A2 Medical. Due to Defendant's misrepresentations, NuVasive and Thermal Surgical did not discover Defendant's deception until well after he had successfully converted all of the LRGH business to A2 Medical.

80.     Defendant's intentional interference and malicious, false, and fraudulent misrepresentations caused NuVasive to incur monetary damages and create a right under Vermont common law to an award of punitive damages to NuVasive.

81.     The amount of those damages was liquidated as part of Defendant's bankruptcy at $1,200,000.00 as of September 20, 2016. Defendant is entitled to a credit against that amount for the $48,077.97 collected by NuVasive from the bankruptcy estate resulting in a new amount owed as of September 20, 2016, of $1,151,922.03.

## PRAYER FOR RELIEF

WHEREFORE, NuVasive prays that this Court enter judgment against Defendant, and award NuVasive the following relief:

   A. Damages in the net amount of $1,151,922.03 as liquidated and credited in Defendant's bankruptcy;

   B. Reasonable attorney's fees and costs incurred prosecuting this action;

   C. Pre- and post-judgment interest; and

   D. Such other and further relief the Court deems just and proper.

Dated: May ____, 2019

Respectfully submitted,

_____
Gary F. Karnedy, Esq.
Primmer Piper Eggleston & Cramer PC
30 Main Street, Suite 500
Burlington, Vermont 05402-1489
(802) 864-0880
gkarnedy@primmer.com

Christopher W. Cardwell, Esq. (*pro hac vice* forthcoming)
M. Thomas McFarland, Esq. (*pro hac vice* forthcoming)
GULLETT, SANFORD, ROBINSON & MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
(615) 244-4994 (Telephone)
ccardwell@gsrm.com
tmcfarland@gsrm.com

*Attorneys for NuVasive, Inc.*

/2015284

*3853377.1*